UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

VINCENT CULLIVER,

     Plaintiff,

v.                               Case No. 3:21cv4942-MCR-HTC

BP EXPLORATION &
PRODUCTION, INC., et al.,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

In this toxic tort case, Plaintiff Vincent Culliver alleges his exposure to chemicals during the *Deepwater Horizon* oil spill response caused his prostate cancer. Defendants BP Exploration & Production Inc. and BP America Production Company (collectively, "BP") have moved under Federal Rule of Evidence 702 and *Daubert*[1] to exclude Plaintiff's exposure experts, Ranajit Sahu, Ph.D., and James JJ. Clark, Ph.D., Docs. 154 & 155, and Plaintiff's causation expert, Benjamin Rybicki, Ph.D., Doc. 159. BP also: (1) moved to strike portions of a declaration submitted by Dr. Rybicki as untimely, Doc. 180; and (2) moved for summary judgment, arguing Plaintiff has not presented admissible expert testimony on causation and, thus, judgment should be entered in its favor, Doc. 160.

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

After reviewing the parties' submissions, *see* Plaintiff's responses, Docs. 170, 171, 175, 176, & 181, and the relevant law, the undersigned concludes: BP's motions to exclude Dr. Rybicki and Dr. Sahu should be GRANTED; BP's motion to exclude Dr. Clark should be GRANTED to the extent his risk assessments should be excluded; and BP's motion to strike should be DENIED. None of the experts' opinions are reliable or helpful and none establish a dose at which exposure to polycyclic aromatic hydrocarbons ("PAHs") can cause prostate cancer. Also, without reliable expert testimony to establish causation, the undersigned finds BP's motion for summary judgment should be GRANTED.

Because the undersigned finds BP's motion for summary judgment should be granted, it is unnecessary to address Plaintiff's separate motions to exclude five of BP's experts. Docs. 156, 157, 158, 161, & 162. Thus, those motions should be DENIED AS MOOT.

## I.    Background

On April 20, 2010, the oil-drilling rig *Deepwater Horizon*, operated by BP in the Gulf of Mexico, exploded, resulting in the largest oil spill in the history of marine oil-drilling operations. A massive effort responded to the spill, with as many as 90,000 workers engaged in near-shore and offshore response activities. The incident resulted in thousands of claims being filed against BP, which were originally consolidated in the Eastern District of Louisiana as part of the *Deepwater Horizon*

multidistrict litigation (MDL No. 2179).  The MDL court approved a comprehensive Medical Benefits Class Action Settlement Agreement for personal injury plaintiffs. The Settlement Agreement provided a claims process for eligible class members who were diagnosed with a specified physical condition on or before April 16, 2012, and a separate litigation option for those seeking compensation for "Later-Manifested Physical Conditions" ("LMPCs"), defined as a physical condition diagnosed after the April 2012 cutoff date.  This separate litigation of claims related to LMPCs is known as the "Back End Litigation Option" ("BELO").

Culliver alleges he worked as a shoreline cleanup worker and boom decontaminator from May to September 2010.  He claims the PAHs he was exposed to during his oil spill response work caused him to develop prostate cancer, which was diagnosed in 2019.  Doc. 1.

## II.    Legal Standard

The Eleventh Circuit has divided cases involving allegedly toxic substances into two categories.  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005).  In the first category, the medical community generally recognizes the substance at issue is toxic and can cause the injury the plaintiff alleges; examples "include toxins like asbestos, which causes asbestosis and mesothelioma; silica, which causes silicosis; and cigarette smoke, which causes cancer." *Id.*  For this first category, "[t]he court need not undertake an extensive *Daubert* analysis on the

general toxicity question" because "the medical community recognizes that the agent causes the type of harm a plaintiff alleges." *Id.*

In contrast, in the second category of cases, "the medical community does not generally recognize the agent as both toxic and causing the injury plaintiff alleges." *Id.* These cases require an expert to establish both general causation ("whether the drug or chemical *can* cause the harm plaintiff alleges") and specific causation ("was plaintiff exposed to enough of the toxin to cause the alleged injury and did the toxin in fact cause the injury"). *Id.*

The parties agree this case falls into the second category of toxic tort cases and, thus, Plaintiff must establish both general and specific causation. To do so, Plaintiff must present admissible, reliable expert testimony. *Id.*; *see also In re Deepwater Horizon BELO Cases*, 2022 WL 104243, at *2 (11th Cir. Jan. 11, 2022) ("In a toxic-tort case like this one, a plaintiff must establish both general and specific causation through admissible, reliable expert testimony.").

Under the Federal Rules of Evidence, expert opinion testimony is admissible only if "the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable

application of the principles and methods to the facts of the case." Fed. R. Evid.

702. Under Rule 702, the Court must act as a gatekeeper and ensure "that an expert's

testimony both rests on a reliable foundation and is relevant to the task at hand."

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

## III.   Dr. Rybicki

Plaintiff seeks to meet his burden of establishing general and specific

causation through the opinions of an epidemiologist, Dr. Rybicki.  Based on his

review of the scientific literature, Dr. Rybicki asserts PAHs "must be considered a

potential prostate cancer risk factor that can be cancer-causing in the occupational

setting."  Doc. 159-1 at 19.  As part of Dr. Rybicki's opinion, he relies upon an

analysis of Plaintiff's exposures performed by Dr. Clark and concludes based on that

assessment that Plaintiff's exposure to PAHs during his oil spill response work

caused his prostate cancer.

BP has moved to exclude Dr. Rybicki's causation opinions, arguing they are

unreliable and unhelpful.  Doc. 159.  The undersigned agrees.  Dr. Rybicki's general

causation opinion is inadmissible because he does not identify a harmful dose of

PAHs, and he does not demonstrate he has a reliable basis for concluding the PAH

exposures of an oil spill response worker can cause prostate cancer.  Additionally,

Dr. Rybicki's specific causation opinion is inadmissible because he does not show

the levels of PAHs Plaintiff was exposed to would be sufficient to cause prostate

cancer, and he did not adequately explore possible alternative causes of Plaintiff's prostate cancer.

### A.    General Causation

Dr. Rybicki attempts to use epidemiology to establish general causation between PAH exposure and prostate cancer.  "Epidemiology, a field that concerns itself with finding the causal nexus between external factors and disease, is generally considered to be the best evidence of causation in toxic tort actions." *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002).  "The first step in establishing causation through epidemiology is to demonstrate that exposure to a [chemical] is associated with a particular disease or adverse effect." *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1306 (N.D. Fla. 2018).  However, "[b]ecause of the potential for data to show associations through confounding or through random chance, epidemiologists must evaluate data to decide whether an observed association is from chance, from confounding, or from a causal relationship." *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1186 (S.D. Fla. 2022).  To perform that evaluation, epidemiologists rely on the Bradford Hill factors, which are: "temporality (how long did the disease take to develop after exposure); the strength of the association (how high or low is the risk); dose response (does a greater dose show greater risk); replication (have a study's findings been replicated in different populations); biological plausibility (is there a

sound biological reason for the findings); alternative explanations for the findings; cessation (does a cessation of exposure reduce the risk); specificity (can the exposure be traced to specific diseases); and are the results consistent with all other relevant knowledge." *Id.*

### i. Failure to Identify a Harmful Dose

As an initial matter, Dr. Rybicki's general causation opinion is inadmissible because he does not identify the harmful level at which the PAH benzo[a]pyrene specifically, or PAHs generally, can cause prostate cancer in humans.   In the Eleventh Circuit, scientific knowledge of the harmful level of exposure to a chemical is a minimal fact necessary to sustain the plaintiff's burden in a toxic tort case. *McClain*, 401 F.3d at 1241; *see also Pinares v. Raytheon Techs. Corp.*, 2023 WL 2661521, at *4 (11th Cir. Mar. 28, 2023) ("Because Dr. Wylie didn't explain how much exposure to the Raytheon facility chemicals is 'too much,' his opinion wasn't sufficiently reliable under *Daubert* to be admissible expert testimony.") (citations omitted); *Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 595 (11th Cir. 2019) (In "cases involving allegedly toxic drugs and chemicals[,]" "given the 'importance of individual responses to toxins,' a plaintiff must demonstrate both the level of exposure to the allegedly harmful chemical that is hazardous to a human being and the amount of the chemical to which the plaintiff was exposed.") (quoting *McClain*, 401 F.3d at 1241-42).   Indeed, this Court has previously held, "consistent with

Case 3:21-cv-04942-MCR-HTC    Document 182    Filed 04/03/24    Page 8 of 39

Page 8 of 39

*McClain*, other cases from this Circuit, and other BELO cases, that to be reliable and helpful, a general causation expert in these BELO cases must identify a harmful level at which a chemical in the oil or dispersant can cause the LMPCs at issue[.]" *In re Deepwater Horizon Belo Cases*, 2022 WL 17721595, at *6-8 (N.D. Fla. Dec. 15, 2022), *report and recommendation adopted*, 2023 WL 2711573 (N.D. Fla. Mar. 30, 2023) (providing a thorough discussion of the harmful level requirement).

Dr. Rybicki's report, however, fails to identify a harmful level of exposure to PAHs, a class of over 200 chemicals that are "almost everywhere" and that "most individuals" have some exposure to each day. Doc. 159-2 (Rybicki Dep., 65:13 – 66:1). Dr. Rybicki confirmed during his deposition that he is not offering "any testimony on the PAH exposure level necessary to cause prostate cancer in humans." Doc. 159-2 (Rybicki Dep., 77:21-24). In fact, he testified that identifying a harmful level of PAH exposure was "not possible."[2] Doc. 159-2 (Rybicki Dep., 77:4-10). Rather than identify a "quantitative" dose, Dr. Rybicki stated his "qualitative opinion" about the harmful dose was that it "would be on the medium to high end of the overall spectrum of PAH exposures within an occupational setting." Doc. 159-2 (Rybicki Dep., 173:9-20). However, without some kind of quantification, this

---

[2] Despite this testimony, Plaintiff suggests Dr. Rybicki "identified a harmful level of exposure to benzo(a)pyrene (PAHs) in his report using animal studies[.]" Doc. 171 at 9-10. However, the referenced animal study evaluated the development of skin cancer in mice after applying benzo[a]pyrene to their skin. Dr. Rybicki offered no explanation for how this study sheds any light on the development of prostate cancer in humans following oil spill response work.

Case No. 3:21cv4942-MCR-HTC

"qualitative opinion" is too vague to be helpful because, as will be explained below, Dr. Rybicki offers no basis for concluding Plaintiff's exposure during his response work was "on the medium to high end" of the spectrum of PAH exposures.

Dr. Rybicki's failure to identify the level of PAH exposure which can cause prostate cancer makes his general causation opinion unhelpful. *See In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *15 (N.D. Fla. Nov. 4, 2020) ("An opinion on general causation in the context of [BELO] cases is only helpful and a good 'fit' if it reliably shows 'general toxicity for the harm Plaintiffs allege' and establishes an exposure level that is considered 'hazardous to human beings generally.'") (quoting *McClain*, 401 F.3d at 1239, 1241); *see also McGill v. BP Exploration & Prod., Inc.*, 830 F. App'x 430, 433 (5th Cir. 2020) (affirming exclusion of expert's general causation opinion in BELO case when he failed to identify the level of oil or dispersant which is harmful to humans). In fact, as BP points out, Dr. Rybicki was recently excluded by the Eastern District of Louisiana in a BELO case for that very flaw. *See* Doc. 159-3 (September 2023 oral ruling from the Eastern District of Louisiana excluding Dr. Rybicki's general causation opinion for failing to identify the level of PAH exposure which can cause prostate cancer in humans).

### ii.    Use of Dissimilar Studies

Even assuming Dr. Rybicki was not required to identify the harmful level at which PAHs can cause prostate cancer, his general causation opinion would still be inadmissible because he does not adequately explain how the studies he relied on provide a reliable basis for concluding the PAH exposure associated with cleaning up an oil spill can cause prostate cancer.

First, Dr. Rybicki failed to explain how the studies he relied on are relevant to the facts of this case when they involve work exposures to different substances and in different contexts.    Dr. Rybicki cited studies of workers who experienced occupational exposures to substances such as chimney soot, metalworking fluids, coal, and wood to conclude there was an association between PAHs and prostate cancer.  Doc. 159-1 at 12-13.  While Dr. Rybicki selected these studies based on the workers' likelihood of PAH exposure, he failed to explain whether the workers in the studies would have been exposed to the same types or concentrations of PAHs as Plaintiff.  He acknowledges: (1) "over 200 chemicals" are classified as PAHs, Doc. 159-1 at 11; (2) PAH mixtures are unique to the generation source and workers in different industries are exposed to different combinations of PAHs, Doc. 159-2 (Rybicki Dep., 50:6-12, 65:13-21); and (3) the International Agency for Research

on Cancer ("IARC") evaluated 60 individual PAHs and concluded only one, benzo[a]pyrene, was carcinogenic to humans,[3] Doc. 159-1 at 11.

Nevertheless, Dr. Rybicki testified he did not know whether the PAH content in chimney soot, metalworking fluids, coal, and wood would be comparable to the PAH content in weathered crude oil.[4] Doc. 159-2 (Rybicki Dep., 48:5 – 50:1; 51:3-15; 52:4 – 53:9). Although nothing prevents a plaintiff from alleging their exposure to a mixture of chemicals caused their injury, using a study which identifies an association between one mixture of chemicals and a certain injury to infer that exposure to a different mixture of chemicals can also cause that injury does not reflect a sound methodology, absent some rational explanation for why such an inference is permissible. *See Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d

---

[3] The IARC's designation of benzo[a]pyrene as a carcinogen, generally, is not sufficient to show it can cause prostate cancer. *See Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 196-197 (5th Cir. 1996) (noting "the fact that EtO has been classified as a carcinogen by agencies responsible for public health regulations" and that "[e]vidence has been found that suggests a connection between EtO exposure and human lymphatic and hematopoietic cancers" is not probative of whether the plaintiff's brain cancer was caused by EtO exposure).

[4] Dr. Rybicki's declaration suggests relying on studies involving mineral oil is appropriate based on the material safety data sheet ("MSDS") for Mississippi Canyon 252 Weathered Crude Oil. Doc. 171-3 at 3. The MSDS states no occupational exposure limits for weathered crude oil have been established, but under the "other applicable exposure limit values" section, it lists the exposure limits for mineral oil set by NIOSH, ACGIH, and OSHA. Doc. 170-2 at 4. Nevertheless, the MSDS, standing alone, does not provide convincing support for the proposition that epidemiological studies regarding exposure to mineral oil and prostate cancer can be used to infer causation between exposure to PAHs associated with the *Deepwater Horizon* oil spill and prostate cancer. *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 465 (5th Cir. 2012) ("[I]n exercising its discretion as a gatekeeper, a court may refrain from treating a MSDS as reliable until it is presented with scientific evidence justifying the relevant statements found within the MSDS.") (citation omitted).

1183, 1196-97 (11th Cir. 2010) (noting courts will admit expert opinions on general causation that are supported by epidemiological studies, "provided the expert explains how the findings of those studies may be reliably connected to the facts of the particular case") (citation omitted).

Also, these occupational exposure studies involved workers who were exposed for much longer periods of time than oil spill response workers like Plaintiff. Dr. Rybicki testified the studies he relied on generally dealt with long-term exposures and excluded short-term exposures,[5] Doc. 159-2 (Rybicki Dep., 55:1-14; 147:1-7), but Plaintiff performed response work for fewer than 90 days according to Dr. Clark's exposure assessment, Doc. 155-2 at 48, 79, 86. And despite admitting "[t]he mode of exposure, exposure duration, and exposure dose are important parameters for the severity of PAHs' toxic effects," Doc. 159-1 at 11, Dr. Rybicki failed to explain how studies showing an association between prostate cancer and multiple years of PAH exposure could be used to conclude there is an association between prostate cancer and less than 90 days of PAH exposure. *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352-53 (5th Cir. 2007) (concluding study did "not appear to be very relevant to [the plaintiff's] claim" and district court did not err when determining study "was unreliable as support" for

---

[5] *See, e.g.*, Doc. 159-1 at 12 (indicating the study of Swedish chimney sweeps involved at least 10 years of occupational exposure); 2005 study of auto industry workers by Ilir Agalliu et al. (indicating the mean duration of employment for study participants was over 20 years).

general causation opinion when the plaintiff, "who worked as a tankerman for only one year, [did] not allege the type of exposure, either in terms of the chemicals involved or the length of exposure, experienced by 'shipyard workers' in the … study").

Likewise, Dr. Rybicki relied on a study he published in 2006 to support his general causation opinion. Doc. 159-1 at 13. He noted the study showed "no association" between occupational PAH exposure and prostate cancer risk generally but it did show statistically significant positive associations between PAH exposure and prostate cancer risk in men with a certain gene variant. Doc. 159-1 at 13; *see also* Rybicki B.A., et al., "Prostate cancer risk from occupational exposure to polycyclic aromatic hydrocarbons interacting with the GSTP1 Ile105Val polymorphism" ("Our results suggest men who carry the *GSTP1 Val$^{105}$* variant and are exposed at high levels to occupational PAH have increased risk for prostate cancer."). However, in addition to admitting the study's findings had never been replicated, Dr. Rybicki testified during his deposition that he did not know whether Plaintiff had this gene variant. Doc. 167-3 (Rybicki Dep., 144:25 – 145:13).[6] Thus, the study provides no discernible support for Plaintiff's case. Indeed, the study potentially undermines Dr. Rybicki's general causation opinion since it did not find

---

[6] BP attached excerpts of Dr. Rybicki's deposition to its motion to exclude him. Doc. 159-2. The undersigned has reviewed the complete transcript of Dr. Rybicki's deposition, which can be found at Doc. 167-3.

a statistically significant association between occupational PAH exposure and prostate cancer.

### iii.    Inadequate Bradford Hill Analysis

Dr. Rybicki's general causation opinion is also unreliable because he did not perform a meaningful analysis of the Bradford Hill factors to reach the conclusion that the association he purportedly identified reflected a true causal relationship.

First, Dr. Rybicki states that when an epidemiologist weighs the evidence for a given exposure causing a specific type of cancer, "[t]here should be a strong association between the presence of an exposure and the occurrence of the cancer[,]" and "[r]elative risks less than 2 are generally not considered strong[.]"  Doc. 159-1 at 7.  However, none of the studies Dr. Rybicki cited involving chimney soot, metalworking fluids, coal, or wood showed a statistically significant relative risk of 2 or more.  Doc. 167-3 (Rybicki Dep., 45:11-21); *see Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 n.16 (11th Cir. 1999) (stating "[t]he threshold for concluding that an agent more likely than not caused a disease is 2.0" and noting "we do not think the district court abused its discretion in finding a 1.24 risk minimal in terms of causation").  The chimney sweep study and the first study of auto industry workers showed standardized mortality ratios of 169 and 128, respectively.[7]  The second

---

[7] The standardized mortality ratio ("SMR") "may be quoted as either a ratio or a percentage.  If the SMR is quoted as a ratio and is equal to 1.0, then this means the number of observed deaths

study of auto industry workers, and the studies regarding coal and wood, showed relative risks of 1.09, 1.99, and 2.1, respectively. The relative risk of 2.1 in the study regarding wood was not statistically significant. Doc. 159-1 at 12-13.

Dr. Rybicki's report and testimony acknowledge the associations between PAH exposure and prostate cancer he observed would not, "in the strictest sense," satisfy the Bradford Hill factor regarding strength of the association. Doc. 159-1 at 18; Doc. 159-2 (Rybicki Dep., 131:16 – 132:9). In fact, it seems even Dr. Rybicki is not convinced a true association exists between PAH exposure and prostate cancer. *See* Doc. 159-1 at 18 ("[T]he existence of studies with a demonstrated association suggests that an association between PAH exposure and increased prostate cancer risk *may be real but requires more precise exposure assessment methodology to be codified.*") (emphasis added). Nevertheless, despite the lack of a strong association between PAH exposure and prostate cancer, Dr. Rybicki inferred there was a causal relationship.

Second, despite acknowledging "alternative explanations for an exposure-cancer relationship … should always be considered before concluding an exposure causes a cancer," Doc. 159-1 at 8, Dr. Rybicki did not meaningfully consider

---

equals that of expected cases. If higher than 1.0, then there is a higher number of deaths than would be expected under normal circumstances. Similarly, an SMR of 100 would mean that the risk in the study population is equal to that of the general population. For example, an SMR of 641 represents a relative risk of dying from a particular cancer that is 6.4 times greater than that of the general population." *Taylor v. Airco, Inc.*, 494 F. Supp. 2d 21, 25 n.4 (D. Mass. 2007).

whether alternative explanations existed for the associations he observed in the studies of occupational PAH exposure. The workers in at least some of the studies Dr. Rybicki relied on were exposed to more than just PAHs. Dr. Rybicki's report notes "chimney soot is rich in PAHs as well as other carcinogenic compounds," Doc. 159-1 at 12, but he admitted during his deposition that he did not examine what other carcinogenic compounds are present in chimney soot, Doc. 159-2 (Rybicki Dep., 146:11-17). And when he was advised the study author identified those other carcinogens as arsenic, chromium, cadmium, and nickel, he admitted it was unlikely oil spill response workers would have been exposed to those carcinogens.[8] Doc. 159-2 (Rybicki Dep., 146:18-25).

Dr. Rybicki's failure to examine those other carcinogens and failure to explain why he concluded the increased rate of prostate cancer in chimney sweeps was due to PAH exposure rather than exposure to the other carcinogens indicate he did not employ a rigorous methodology. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 145-45 (1997) (finding epidemiological study where subjects were "exposed to numerous potential carcinogens" in addition to PCBs was "no help" to expert trying to link PCB exposure to lung cancer). Thus, Dr. Rybicki failed to explain how his conclusion—that the PAH exposures of oil spill response workers can cause prostate

---

[8] Notably, the IARC Monographs indicate arsenic and cadmium could potentially cause prostate cancer in humans. Doc. 156-5 at 9.

cancer—is reliably supported by the studies he relied on—which show an association between prostate cancer and workers in different settings exposed to different types of PAHs and carcinogens. *See Knight*, 482 F.3d at 352-53 (affirming district court's finding that studies did not provide reliable support for expert's general causation opinion when the exposures in the studies included chemicals the plaintiffs were never exposed to); *Anderson v. Bristol Myers Squibb Co.*, 1998 WL 35178199, at *11 (S.D. Tex. Apr. 20, 1998) ("[T]he fact that Dr. Duvic's studies are scientifically valid for the conclusion drawn therein, that is, the conclusion that there is an association between staph infections and CTCL, the studies are not necessarily scientifically valid for the very different causation conclusion drawn by Dr. Duvic in this case.").

Third, Dr. Rybicki testified the consistency factor, which considers whether a study's findings have been replicated in different populations, was also not satisfied in this case. Doc. 159-2 (Rybicki Dep., 132:10-18); *see also* Doc. 159-1 at 18 (Dr. Rybicki indicating "[a] lack of uniform findings of an association between PAH exposure and elevated prostate cancer risk could be that such an association does not exist").

Based on the foregoing, Dr. Rybicki did not meaningfully consider the Bradford Hill factors. He failed to examine whether alternative explanations existed for the associations he observed in the literature, despite claiming such explanations

"should always be considered." Doc. 159-1 at 8. And he failed to explain why he concluded there "is moderate to strong support" for "PAH exposure having a causative role in prostate cancer," Doc. 159-1 at 19, despite finding that the strength of the association and consistency factors were not satisfied. This does not indicate his opinion was the product of a reliable methodology.

### iv.    Other Flaws

Additionally, Dr. Rybicki's general causation opinion suffers from several other flaws. The record reflects Dr. Rybicki cherry picked both the sources he considered, as well as the findings from those sources. *See In re Zantac*, 644 F. Supp. 3d at 1158 (noting courts have held that "cherry-picking of data demonstrates unreliability and may justify the exclusion of an expert's testimony"). For example, Dr. Rybicki cited the IARC for the determination that the PAH benzo[a]pyrene is generally carcinogenic to humans. Doc. 159-1 at 11. However, his report neglects to mention the IARC: (1) has not identified any carcinogenic agents of prostate cancer with sufficient evidence in humans; (2) has identified a list of agents of prostate cancer with limited evidence in humans that does not include PAHs; and (3) did not find an association between exposure to crude oil and prostate cancer. Doc. 156-5 at 9; Doc. 159-2 (Rybicki Dep., 108:8-24). He also conceded the IARC has found the current scientific literature is not sufficient to conclude PAH exposure causes prostate cancer. Doc. 159-2 (Rybicki Dep., 111:3 – 112:8). Nevertheless,

Dr. Rybicki fails to explain why he reached a different conclusion regarding the ability of PAHs to cause prostate cancer. *See Vandestreek v. Lockheed Martin Corp.*, 2023 WL 6396087, at *7 (M.D. Fla. Sept. 27, 2023) (citing public health organizations such as the IARC for some of their conclusions while ignoring others "smacks of cherry-picking the data").

As another example, Dr. Rybicki relied on a 2005 study of auto industry workers exposed to metalworking fluids to support his general causation opinion. Doc. 159-1 at 13. Dr. Rybicki neglected to mention, however, that the authors concluded "exposure to oil-based fluids, soluble and straight, is modestly associated with prostate cancer risk among autoworkers, *with a latency period of at least 25 years*." Thus, Dr. Rybicki never explained how a study which concluded there would be a latency period of at least 25 years supports his theory of causation in this case, where only 9 years elapsed between Plaintiff's response work and his prostate cancer diagnosis.

In addition, although not relied on as "direct evidence of causation," Dr. Rybicki cited a study of the 2007 *Hebei Spirit* oil spill off the coast of South Korea to "support the general proposition that acute exposure events from oil spills have documented increased cancer risks, including prostate cancer." Doc. 159-1 at 14. When Dr. Rybicki testified in August 2023 about the lack of studies showing *Deepwater Horizon* response workers experienced increased rates of any type of

cancer, he stated it would be "almost impossible for such a study to exist" because "the exposure happened in 2010 or 2013 [and] there's not enough time to accumulate enough cancer cases to really do a statistically powerful enough epidemiologic study." Doc. 159-2 (Rybicki Dep., 58:14-25). However, the *Hebei Spirit* study, which was published in 2018, only looked at cancer incidence rates in South Korea from 1999 to 2014, which is at most seven years after any exposure related to that 2007 oil spill. Thus, it is unclear why he considers the *Hebei Spirit* study to be reliable "supplemental evidence to the primary studies [he] relied on to form [his] causation opinion," Doc. 159-1 at 14, when his expert report and testimony indicate: (1) prostate cancer "is generally a slow growing cancer" with a latency period of typically 10 to 15 years, Doc. 159-1 at 22; Doc. 167-3 (Rybicki Dep., 97:17-22); and (2) "it is premature [in 2023] to conduct a study of increased population cancer rates resulting from the [2010] BP Gulf Oil spill," Doc. 159-1 at 7.

### B.    Specific Causation

In the absence of admissible testimony regarding general causation, there is no need to determine whether a plaintiff has established specific causation. *See Knight*, 482 F.3d at 351 ("Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence.") (citation omitted). Regardless, like his general causation opinion, Dr. Rybicki's specific causation opinion is also inadmissible. Dr. Rybicki did not independently

assess Plaintiff's exposure to PAHs; instead, he relied on Dr. Clark's assessment of Plaintiff's dose.[9]  Doc. 159-2 (Rybicki Dep., 30:1-8).  But even if Dr. Clark's dose assessment was reliable, Dr. Rybicki failed to: (1) explain his basis for concluding the PAH exposure levels for Plaintiff calculated by Dr. Clark were sufficient to cause Plaintiff's prostate cancer; and (2) meaningfully consider possible alternative causes of Plaintiff's prostate cancer.

### i.   Failure to Compare Plaintiff's Exposure Levels

Assuming Dr. Clark's quantification of Plaintiff's exposure levels is accurate, Dr. Rybicki failed to show the amount of PAHs Plaintiff was exposed to during his roughly 90-day stint as a response worker was sufficient to cause prostate cancer.

First, because Dr. Rybicki did not identify a harmful dose of PAHs capable of causing prostate cancer, he cannot opine that Plaintiff's PAH exposure level—as calculated by Dr. Clark—exceeded a harmful dose threshold. *See Pinares*, 2023 WL 2661521, at *5 (affirming exclusion of expert who concluded 8,000 micrograms was a sufficient dose to cause the plaintiff's kidney cancer because he never demonstrated "the level of exposure to the allegedly harmful chemical that is hazardous to a human being" and, thus, "provided no reliable baseline against which

---

[9] As discussed below in Section IV.A., BP also challenges Dr. Clark's opinions, which the undersigned agrees should be excluded in part.

the district court could evaluate his conclusions as to [the plaintiff's] estimated exposure") (citation omitted).

Second, while Dr. Rybicki made a general observation that Plaintiff and the workers in the studies he relied on were both exposed to PAHs, he offered no scientific basis for concluding Plaintiff's and those workers' exposure levels were comparable, despite seeming to acknowledge the importance of making such a comparison in his report and during his deposition.[10]  Indeed, the failure to make such a comparison here is particularly problematic, because, as previously noted, the workers in the studies Dr. Rybicki relied on had multiple years, and sometimes decades, of occupational exposure, while Plaintiff had less than 90 days.

In sum, Dr. Rybicki's specific causation opinion does not pass *Daubert* muster because he provides no basis for his conclusion that "[t]he existing scientific literature supports the PAH exposures experienced by the plaintiff, as documented by [Dr. Clark], increased his risk of a diagnosis of prostate cancer."  Doc. 159-1 at

---

[10] *See* Doc. 159-1 at 13 (Dr. Rybicki suggested "one explanation for the lack of significant findings" in a recent study which showed "generally no association between exposure to benzo[a]pyrene and other PAHs, and overall prostate cancer risk," was "the overall lower levels of occupational PAH exposures in contemporary occupational cohorts."); Doc. 159-2 (Rybicki Dep., 25:11-25) (explaining specific causation involves considering: (1) "what [Plaintiff's] occupational exposure was in relation then to his subsequent diagnosis of prostate cancer and whether that evidence of general causation would be consistent with this specific case"; and (2) "whether [Plaintiff's] experience would be consistent with what we have seen in epidemiologic study in terms of an exposure happening before the disease onset").

22;[11] *see Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1246 (11th Cir. 2018) (affirming exclusion of expert because even assuming his "dose estimates were methodologically sound, he failed to demonstrate a scientific basis for concluding that those exposure levels would likely produce, contribute to, or exacerbate [the plaintiff's] conditions"); *McClain*, 401 F.3d at 1241 (noting knowledge that the plaintiff was exposed to a harmful level of a chemical is one of the "minimal facts necessary to sustain the plaintiff's burden" in a toxic tort case); *id.* at 1242 (excluding expert who "simply substituted his own *ipse dixit* for scientific proof").

### ii.    Failure to Consider Potential Alternative Causes

Dr. Rybicki's specific causation opinion is also unreliable because he did not meaningfully consider alternative causes for Plaintiff's prostate cancer.  Dr. Rybicki noted Plaintiff had "previous possible occupational exposures" when he worked in the mold and asbestos removal business and then as a welder but concluded "none were either of long enough duration and/or included any evidence of exposure to carcinogenic agents to warrant serious consideration[] as competing causes for his prostate cancer diagnosis."  Doc. 159-1 at 22-23.

---

[11] For example, Dr. Rybicki described Dr. Clark's calculation of Plaintiff's "exposure to benzo[a]pyrene through particulate matter (inhalation)" as "particularly notable."  Doc. 159-1 at 22.  But Dr. Rybicki did not explain why it was notable, nor did he mention that Dr. Clark estimated the cancer risk from that exposure to be $2.45 \times 10^{-13}$, Doc. 155-2 at 85, which is less than one in a trillion.

However, Dr. Rybicki has not articulated a scientific basis for reaching this conclusion.[12]  He testified in his deposition that Plaintiff's work as a welder and in asbestos removal were "obviously longer in duration," but said he did not "think the intensity of the exposure compared to his history in the oil clean up work."  Doc. 159-2 (Rybicki Dep., 121:7-10).  But Dr. Rybicki admitted during his deposition that he did *no* research regarding Plaintiff's exposures as a welder or to asbestos. Doc. 159-2 (Rybicki Dep., 121:11-15).  And his report reflects that lack of research, as it does not discuss what chemicals Plaintiff would have been exposed to while working as a welder or whether studies showed an association between prostate cancer and asbestos or work as a welder.  Instead, Dr. Rybicki testified he simply "didn't feel like" Plaintiff's jobs in welding or asbestos removal were "an overriding reason why they would contribute to his cancer."  Doc. 159-2 (Rybicki Dep., 121:20-25).

While Dr. Rybicki did not have to quantify the risk of alternative causes of Plaintiff's prostate cancer, Dr. Rybicki's failure to investigate and provide a reasoned scientific explanation for excluding Plaintiff's previous occupational exposures as the cause of his prostate cancer renders his specific causation opinion unreliable.  *See Hendrix*, 609 F.3d at 1197 (when using a differential etiology

---

[12] Dr. Rybicki did opine that Plaintiff's exposure to asbestos would have been limited due to his managerial role and use of personal protective equipment.

analysis an "expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation") (quoting *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003)); *see also Williams*, 889 F.3d at 1249 (finding expert failed to meaningfully rule out other potential causes of the plaintiff's conditions when he made only "passing references to the purported 'low' probability of those other causes" and "never provided the District Court with any scientific basis upon which he relied in concluding that the likelihood that various other potential factors caused [the plaintiff's] conditions was low enough to reasonably rule them out").

### C.    Dr. Rybicki's Declaration

Plaintiff attached a declaration from Dr. Rybicki to the response to BP's motion to exclude him.  BP filed a motion to strike portions of the declaration, arguing they constitute untimely expert opinions and rely on previously undisclosed studies.  Doc. 180.  Counsel in these BELO cases have made it a habit of submitting declarations from their experts containing new opinions, expounding on existing opinions, or otherwise attempting to fix gaps in the opinions that are pointed out by BP.  While the undersigned agrees such a tactic is not acceptable, here, even if the Court were to consider the declaration, it still does not make Dr. Rybicki's causation opinions admissible.  Thus, the motion should be denied.

As an initial matter, most of the "new" studies referenced in Dr. Rybicki's declaration are studies regarding the petroleum industry.[13]  While Dr. Rybicki's declaration explains why he did not feel it was appropriate to rely on the petroleum studies, his discussion of them does not somehow make his general causation opinion reliable or admissible.

Next, Dr. Rybicki's declaration offers additional arguments regarding why he should not be required to identify a harmful dose.  Doc. 171-3 at 3.  This Court, however, has previously rejected such arguments.  *See In re Deepwater Horizon Belo Cases*, 2022 WL 17721595, at *6-8 (N.D. Fla. Dec. 15, 2022), *report and recommendation adopted*, 2023 WL 2711573 (N.D. Fla. Mar. 30, 2023).  The Eleventh Circuit has also rejected the argument advanced by Dr. Rybicki that variations in susceptibility should excuse him from identifying a harmful dose.  *See Williams*, 889 F.3d at 1247-48 ("Though Ms. Williams alleged that, on account of her G6PD, she is more sensitive to exposure than the average member of the general public, Dr. Mink never attempted to quantify *how much* more sensitive she is.").  And Dr. Rybicki's attempt to compare the relationship at issue here to the relationship between cigarette smoke and lung cancer is misplaced, as cigarette

---

[13] Although Dr. Rybicki cited a new study involving metalworking fluids, his declaration contains no discussion of what the study showed, nor does it evaluate the strengths and weaknesses of the study.  Doc. 171-3 at 3.  Thus, the study provides no apparent support for Dr. Rybicki's general causation opinion.

smoke is a *McClain* category one substance which the medical community generally recognizes as being able to cause lung cancer.

Dr. Rybicki also attempts to explain why the IARC's failure to recognize PAHs as causing prostate cancer does not undermine his general causation opinion. Doc. 171-3 at 6-7. He asserts the IARC's findings have limitations, including that: (1) the IARC is incapable of reviewing all potentially cancer-causing exposures and must limit itself to those agents where a sufficient body of scientific evidence has accumulated upon which to review; and (2) even when an agent is determined not to be carcinogenic, the IARC recognizes there is uncertainty regarding the determination. *Id.* at 7.

While there may be limitations associated with the IARC's work, that does not change the fact that Dr. Rybicki's report states the IARC's Monographs are "authoritative documents" in the field of cancer research, Doc. 159-1 at 11, and he testified the IARC has: (1) evaluated the carcinogenicity of crude oil and found no association with prostate cancer; and (2) found exposures to PAH mixtures are not carcinogenic, Doc. 167-3 (Rybicki Dep., 108:18 – 111:2). Thus, Dr. Rybicki should have explained why the conclusions in his report differed from the "authoritative" agency in the field of cancer research.

Dr. Rybicki's declaration also accuses BP and its experts of ignoring a positive association between crude oil exposure and prostate cancer mortality in a

meta-analysis of petroleum worker studies by Wong and Raabe.  Doc. 171-3 at 8.
Wong and Raabe did find an increased standardized mortality ratio of 1.20 (95% CI,
1.01-1.42) for a subset of crude oil workers in the studies they examined.  Doc. 178-
3 at 15.  However, they noted the increase appeared to be concentrated among short-
term workers in certain crafts, and the standardized mortality ratios for long-term
workers in the same crafts were lower and none were significant.  Doc. 178-3 at 11.
Thus, Wong and Raabe concluded "the absence of an upward trend by length of
employment in these workers argue[s] against an association between exposure to
petroleum products and prostate cancer."  Doc. 178-3 at 2.  Furthermore, overall,
Wong and Raabe found no increased mortality from prostate cancer in petroleum
workers.  Doc. 178-3 at 19.  Thus, the Wong and Raabe study does not provide
support for Dr. Rybicki's general causation opinion.  *See LeBlanc v. Chevron USA,
Inc.*, 396 F. App'x 94, 100 (5th Cir. 2010) ("The district court properly rejected the
studies as supporting causation because the authors of the studies concluded that
there was no proof of causation.").

Lastly, Dr. Rybicki critiques a forest plot created by one of BP's experts which
shows the results of twelve studies of petroleum workers and prostate cancer.  Doc.
171-3 at 8-9.  Dr. Rybicki asserts: (1) because "[m]en more often die 'with' prostate
cancer than from it … exposure-disease associations with prostate cancer are
generally better detected using the outcome of prostate cancer incidence rather than

mortality"; and (2) of the studies depicted in the forest plot, "two of the three studies that analyzed prostate cancer incidence showed a positive association with petroleum work."  Doc. 171-3 at 9.

However, Dr. Rybicki claims he did not rely on these two studies, or petroleum studies generally, to support his general causation opinion because they did not include estimates of PAH exposures.  *See LeBlanc*, 396 F. App'x at 99 (studies which "note that the subjects were exposed to a range of substances and then nonspecifically note increases in disease incidence … are not the type that compel a district court to accept the expert's reliance upon them").  Also, despite now claiming that "exposure-disease associations with prostate cancer are generally better detected using the outcome of prostate cancer incidence rather than mortality," two of the studies Dr. Rybicki relied on to form his general causation opinion evaluated mortality ratios, not incidence rates.

## IV.  The Exposure Experts

In addition to Dr. Rybicki, Plaintiff has Dr. Sahu and Dr. Clark as experts. Neither Dr. Sahu nor Dr. Clark, however, speak to general or specific causation. Instead, they simply provide opinions regarding the type of chemicals present in the oil spill and Plaintiff's level of exposure to PAHs, respectively.  Thus, if Dr. Rybicki's opinions do not pass Rule 702 muster, which they do not, the opinions of the other experts do not save Plaintiff's case. *See Ruffin v. BP Exploration & Prod.*

*Inc.*, 2023 WL 7271087 (E.D. La. Oct. 31, 2023) (granting BP's motion for summary judgment after excluding Dr. Rybicki's causation opinions in BELO case involving prostate cancer because Dr. Clark provided only "a toxicity assessment based on EPA thresholds" and did not offer admissible general or specific causation opinions). Nonetheless, out of an abundance of caution, the undersigned will also explain why Dr. Sahu's opinion should be excluded and why Dr. Clark's risk assessment should be excluded.

### A.    Dr. Clark

Plaintiff retained Dr. Clark to evaluate his level of exposure to various chemicals during his oil spill response work, as well as the risks associated with those exposures.    After BP moved to exclude Dr. Clark, both he and Plaintiff confirmed he is not independently offering opinions on either general or specific causation.  *See* Doc. 175 at 14 ("Plaintiff is not offering Dr. Clark to provide any legal causation opinions."); Doc. 175-3 at 8 (declaration from Dr. Clark stating, "I am not offering a legal causation opinion in this case."); *see also* Doc. 155-3 (Clark Dep., 129:19 – 130:8; 147:18-20) (indicating he is not offering a specific causation opinion).[14]  Instead, as discussed above, Dr. Rybicki relied on Dr. Clark's dose and

---

[14] Any attempt by Plaintiff to alter Dr. Clark's opinions to provide a theory of either general or specific causation would be contrary to these clear and unequivocal statements.  Dr. Clark's use of buzz words such as "increased risk" and "substantial contributing factor" does not turn his exposure and risk assessment into a general or specific causation opinion, nor would those opinions

risk calculations to form his specific causation opinion—that is, to conclude Plaintiff's PAH exposure during his spill response work caused his prostate cancer. Doc. 175-3 at 8-9.  Dr. Clark's risk assessment, however, is neither reliable nor helpful.

Dr. Clark used the Environmental Protection Agency's ("EPA") Risk Assessment Guidance for Superfund ("RAGS") to determine the risk associated with Plaintiff's exposure to various chemicals.  The "EPA uses risk assessment to characterize the nature and magnitude of health risks to humans and ecological receptors from chemical contaminants and other stressors that may be present in the environment."  https://www.epa.gov/risk.  The RAGS methodology involves four steps: (1) hazard identification; (2) exposure assessment; (3) toxicity assessment; and (4) risk characterization.  *Edison Wetlands Ass'n, Inc. v. Akzo Nobel Chems., Inc.*, 2009 WL 5206280, at *2-3 (D.N.J. Dec. 22, 2009) (describing the steps and what they entail).  The final step, risk characterization, "involves combining the exposure quantities ... and the toxicity benchmarks ... to calculate the excess lifetime cancer risks (risk) and noncancer hazards (hazard) for each of the pathways and

---

pass *Daubert* muster.  As BP points out, Dr. Clark has no basis for reaching those conclusions when he acknowledges that Plaintiff's exposure to chemicals of concern was below the thresholds deemed safe by the EPA under RAGS.  Indeed, if Dr. Rybicki cannot rely on Dr. Clark's risk assessment to provide an admissible opinion on specific causation, neither can Dr. Clark.

receptors[.]" *Williams v. BP Exploration & Prod. Inc.*, 2024 WL 340237, at *10 (S.D. Miss. Jan. 30, 2024).

In his report, Dr. Clark attempted to calculate the doses of various chemicals Plaintiff was exposed to during his spill response work via three exposure pathways: ingestion, inhalation, and dermal contact. Based on those doses, as well as toxicity values sourced from the EPA, Dr. Clark then estimated the risk Plaintiff faced of developing cancer and non-cancer adverse health outcomes from each chemical individually and the chemicals collectively.

BP challenges the admissibility of both Dr. Clark's risk estimates and his dose calculations. Even assuming Dr. Clark's dose calculations are correct,[15] the risk estimates provided by Dr. Clark and his statements regarding Plaintiff being at an increased risk for prostate cancer are not admissible and cannot be used by Dr. Rybicki to form his specific causation opinion because they are unreliable and not relevant to the facts of this case.

First, Dr. Clark's cancer risk estimates are not specific to prostate cancer. The RAGS cancer risk assessment methodology used by Dr. Clark is based on the theoretical risk of developing cancer generally and is not specific to prostate cancer

---

[15] BP argues Dr. Clark's dose calculations are inadmissible because they are based on undisclosed and unreliable assumptions and ignore data which would more accurately reflect Plaintiff's exposures. Doc. 155 at 28-32. It is not necessary, however, to determine whether Dr. Clark's quantification of Plaintiff's exposure to PAHs is admissible because, even assuming it is, Dr. Rybicki's causation opinions would still be subject to exclusion, for the reasons discussed in Section III.

or any other form of cancer.  Doc. 155-3 (Clark Dep., 128:14-18).  Testimony that Plaintiff may have faced some increased risk of developing an unspecified cancer due to his exposures during his response work says nothing about whether those exposures increased his risk for prostate cancer.  *See Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 197 (5th Cir. 1996) ("Evidence has been found that suggests a connection between EtO exposure and human lymphatic and hematopoietic cancers, but this is not probative on the causation of brain cancer."); *Vandestreek*, 2023 WL 6396087, at *2 ("So even if a substance is harmful to humans as a general matter, the Court must look beyond that to whether the science establishes an undeniable causal link between the substance and the *type of illness* alleged.") (citing *McClain*, 401 F.3d at 1239).  Because Dr. Clark's cancer risk estimates are not tailored to the facts of this case, they are unhelpful and inadmissible.

Second, Dr. Clark's calculations estimated Plaintiff's lifetime excess cancer risk as approximately 1 in 6,500,000 ($1.53 \times 10^{-7}$), which is over 500 times lower than the EPA's regulatory benchmark of 1 in 10,000, and over 5 times lower than the EPA's regulatory benchmark of 1 in 1,000,000.[16]  Doc. 155-3 (Clark Dep.,

---

[16] Due to his concerns about the reliability of data collected by BP, Dr. Clark asserted he used data collected by the National Institute for Occupational Safety & Health ("NIOSH") to calculate Plaintiff's inhalation exposures during his decontamination work and corresponding risk assessments.  However, Dr. Clark mistakenly used BP's data regarding the concentrations of VOCs and PAHs present at the decontamination worksites.  Doc. 155-3 (Clark Dep., 33 – 35).  Because BP's data showed higher concentrations of these chemicals than NIOSH's data, Dr. Clark's initial report overestimated Plaintiff's overall cancer risk.  Doc. 155-3 (Clark Dep., 37:12-

127:3-10). Thus, according to the EPA's own criteria, Plaintiff was not at an increased risk for developing any form of cancer, let alone prostate cancer, based on Dr. Clark's calculations of Plaintiff's exposure and cancer risk. In other words, the EPA deems Plaintiff's estimated exposure levels to be safe. Doc. 155-3 (Clark Dep., 127:19-25, 128:8-13).

Based on the foregoing, Dr. Clark's cancer risk estimates and any opinions he offers regarding Plaintiff being at an increased risk of developing prostate cancer are inadmissible and cannot be used to support Dr. Rybicki's specific causation opinion. *See Williams*, 2024 WL 340237, at *12 (finding Dr. Clark's causation opinions were "unreliable and inadmissible" when his calculations showed a lower risk than what the EPA deems acceptable because "[w]hile he claims that his opinions are based on the EPA RAGS, his conclusions contradict RAGS"); *see also Williams*, 889 F.3d at 1246 (noting it "was methodologically problematic" for expert to use a study measuring the ambient air concentration of pollutants to estimate the plaintiff's dose and conclude the defendant's emissions adversely affected her when the study's authors concluded "the air concentration of the

---

16). His initial report estimated Plaintiff's excess cancer risk from all his exposures as approximately 1 in 5,000,000 ($2.07 \times 10^{-7}$), Doc. 179-5, while the revised risk calculation is approximately 1 in 6,500,000 ($1.53 \times 10^{-7}$), Doc. 179-6. Also, the undersigned notes Plaintiff waited until January 25, 2024—the date he responded to BP's motion to exclude Dr. Clark—to provide BP with Dr. Clark's revised calculations, despite learning of the erroneous calculations during his October 18, 2023, deposition.

various pollutants studied fell hundreds of times below levels that would present health risks to the public").

Lastly, BP notes Dr. Clark's report includes irrelevant information, including an assessment of Plaintiff's risk for developing health conditions other than cancer. Doc. 155 at 22-23. Plaintiff argues the non-cancer risk estimates: (1) "serve as evidence of Plaintiff's level of exposure"; (2) "show the likelihood that Plaintiff would have suffered other non-cancerous health impacts and symptoms"; and (3) are "relevant to Plaintiff's claim for fear of developing future cancer and other diseases." Doc. 175 at 18.

Plaintiff's arguments, however, are misplaced. First, the risk estimates do not serve as evidence of Plaintiff's levels of exposure; those levels are reflected in Dr. Clark's dose calculations. Second, Dr. Rybicki's causation opinions are focused on prostate cancer; his report does not suggest chemicals associated with the oil spill can cause any other illness or that, in fact, they caused Plaintiff any other illness. Thus, the undersigned agrees with BP that Dr. Clark's estimates of the risk Plaintiff faced of developing non-cancer adverse health outcomes are neither relevant to this case nor helpful to the trier of fact. *See Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

### B.    Dr. Sahu

BP also moved to exclude Dr. Sahu, challenging his qualifications as well as the reliability and helpfulness of his opinions.  Doc. 154.  Dr. Sahu's report describes the chemicals of concern *Deepwater Horizon* spill response workers were potentially exposed to and the concentrations of those chemicals.  He opines, generally, that Plaintiff was exposed to a range of chemicals, including PAHs, through inhalation, dermal contact, and ingestion, and concludes the PPE provided to Plaintiff was inadequate.  Doc. 176-1 at 50.  However, Dr. Sahu does not offer opinions on medical causation or on the dose Plaintiff received of any chemical.  Doc. 176 at 2 ("Dr. Sahu was not retained to provide any medical causation opinions or a dose calculation."); Doc. 176-1 at 9 ("This report does not offer opinions on medical causation or constitute a *dose* assessment or reconstruction.").

Plaintiff contends Dr. Sahu's report should not be excluded because Dr. Clark relied "on the data analyzed by Dr. Sahu in performing his exposure assessment for Plaintiff."  Doc. 176 at 10-11.  A review of Dr. Clark's report, however, refutes this argument.  The tables in Dr. Clark's report Plaintiff cites to support this argument indicate Clark used data from a 2015 study by Yin and from a Fairhope, Alabama monitoring station.  Doc. 176-2.  While Dr. Sahu also discussed the data from Yin, Doc. 176-1, it does not appear Dr. Clark ever referenced Dr. Sahu's report when forming his opinions.

As BP notes, Dr. Sahu's report here is substantively identical to the report he submitted in the sinusitis and ocular test cases, and which this Court excluded as unreliable and unhelpful.  *See In re Deepwater Horizon Belo Cases*, 2022 WL 17721595, at *27 (N.D. Fla. Dec. 15, 2022), *report and recommendation adopted*, 2023 WL 2711573 (N.D. Fla. Mar. 30, 2023) (concluding Dr. Sahu did not offer an admissible general causation opinion because his report "merely provides a listing of the numerous chemicals released by the oil spill and an opinion that Plaintiffs could have been exposed to those chemicals").  As this Court previously found, because Dr. Sahu's report does nothing more than identify the chemicals present in the oil spill, generally, which does not advance the ball with regard to establishing either general or specific causation, Dr. Sahu's opinion should be excluded as unhelpful.  *See id.*

## V.    Summary Judgment

As set forth above, Plaintiff has not met his burden of showing Dr. Rybicki's general and specific causation opinions are admissible under Fed. R. Evid. 702.  And without admissible expert testimony regarding causation, Plaintiff cannot prevail on his claims.  *See In re Deepwater Horizon BELO Cases*, 2023 WL 2711573, at *1 ("To succeed in this toxic tort context, Plaintiffs must show through expert testimony that a chemical or mixture of chemicals from the oil spill caused their LMPCs.") (citation omitted).  Thus, summary judgment should be entered in BP's favor.  *See*

*Chapman v. Procter & Gamble Distrib.*, *LLC*, 766 F.3d 1296, 1313 (11th Cir. 2014) ("Evidence inadmissible at trial cannot be used to avoid summary judgment.") (quoting *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007)).

Accordingly, it is RECOMMENDED:

1.  That BP's motion to exclude Dr. Sahu, Doc. 154, be GRANTED.

2.  That BP's motion to exclude Dr. Clark, Doc. 155, be GRANTED to the extent his risk assessments are excluded.

3.  That BP's motion to exclude Plaintiff's causation expert, Dr. Rybicki, Doc. 159, be GRANTED.

4.  That BP's motion to strike the untimely opinions of Dr. Rybicki, Doc. 180, be DENIED.

5.  That Plaintiff's motions to exclude BP's experts, Docs. 156, 157, 158, 161, 162, be DENIED AS MOOT.

6.  That BP's motion for summary judgment, Doc. 160, be GRANTED.

7.  That the clerk be directed to enter judgment in favor of BP and close the file.

At Pensacola, Florida, this 3rd day of April, 2024.

*/s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within **fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u>  An objecting party must serve a copy of its objections upon all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1.